JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney
JOANN M. SWANSON (SBN 88143)
Chief, Civil Division
ABRAHAM A. SIMMONS (SBN 146400)
Assistant United States Attorney

    450 Golden Gate Avenue, 9th Floor
    San Francisco, California 94102-3495
    Telephone:  (415) 436-7264
    Facsimile:  (415) 436-6748
    Email:  abraham.simmons@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ROBERT CARL PATRICK KEANE, individually; and CHIEKO STRANGE, individually,<br><br>                Plaintiffs,<br><br>v.<br><br>SETH M. MCMULLEN, PAUL ACCORNERO and JOHN SILVA,<br><br>                Defendants. | No. C 07-4894 SBA<br><br>SUPPLEMENTAL DECLARATION OF JOHN SILVA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

    I, John Silva, declare as follows:

1.    I am an officer of the Petaluma, California, Police Department. I have personal knowledge of the facts in this declaration and if called to testify, I would and could competently testify as to the facts herein.

2.    I understand that plaintiffs in the above-captioned case allege that their rights were violated when warrants were issued for plaintiff Keane's arrest and for a search of his residence. I further understand that plaintiffs claim that their rights were violated during the execution of the warrants. As explained herein, I did not make the critical decisions nor was I involved with the pivotal acts that plaintiffs claim result in liability.

3.    I did not take responsibility for the intake of this case. To the best of my knowledge, that

job was performed by Special Agent Seth McMullen. Similarly, until the warrants were executed, I had precious little, if any, involvement with the case at all. Specifically, I did not make the decisions whether to seek a warrant, how to prepare the affidavit for the warrant, what facts to put into or exclude from the application for a warrant, or even to which court an application for a warrant would be submitted. Nor did I make such operational decisions as how many officers would be present, who would be in the team that would make the initial breach, what the officers who entered would say, how long they should wait after knocking before entering or any other such facts about which plaintiffs complained in the First Amended Complaint.

4.  While it is true that eventually I did enter the Keane residence, I did so only after it was secured by other federal agents. I was outside during the initial entry. By the time I entered the residence, the plaintiffs already were handcuffed– I did not participate in the handcuffing of plaintiffs. I did not provide the handcuffs. Robert Keane did not complain to me about the handcuffs until we were leaving the residence. At that time, I referred him to Special Agent McMullen who would be transporting Keane to the detention center for booking. As I recall, he did not complain about the handcuffs being too tight; rather, he complained about some other issue related to the fact that he was uncomfortable in handcuffs.

5.  I recall that when I was in the residence, I asked a few follow-up questions to either Robert Keane or his girlfriend, Chieko Strange. This, as I recall, was an attempt to clarify their responses to some of the questions posed by Special Agent McMullen. None of my follow-up questions were designed to threaten them or otherwise attempt to intimidate them. In general, however, it would not be fair to say that I conducted the questioning of plaintiffs.

6.  I am aware of the DEA policy that requires prisoners to remain handcuffed while being transported. It would not be proper procedure to uncuff a prisoner if that prisoner is to remain in custody. Attached hereto as Exhibit 1 is a true and correct copy of the relevant and disclosable portion of the DEA Agent's Manual that discusses this policy.

Supp. Declaration of John Silva
C 07-4894 SBA                                   2

7. I am aware that plaintiffs claim no one identified who they were for some period of time after the initial entry of the residence. This allegation is odd in light of the fact that all the agents who made the initial entry were wearing either raid jackets or some other clothing that identified them as law enforcement.

8. During the entire operation, I did not see any inappropriate behavior. I did not see Special Agent McMullen put his boot on anyone's head, I did not see anyone point their guns at plaintiffs and I did not see that plaintiff's handcuffs were tighter than ordinary and safe. The conduct of the officers was professional as demonstrated in the audio tape that was produced by Accornero of his statements to plaintiff. The description of the behavior of the law enforcement officials in the complaint does not describe the facts as I remember them.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate. Executed this 17th day in June, 2008, in Santa Rosa, California.

_____
John Silva

Supp. Declaration of John Silva
C 07-4894 SBA                                             3

7. I am aware that plaintiffs claim no one identified who they were for some period of time after the initial entry of the residence. This allegation is odd in light of the fact that all the agents who made the initial entry were wearing either raid jackets or some other clothing that identified them as law enforcement.

8. During the entire operation, I did not see any inappropriate behavior. I did not see Special Agent McMullen put his boot on anyone's head, I did not see anyone point their guns at plaintiffs and I did not see that plaintiff's handcuffs were tighter than ordinary and safe. The conduct of the officers was professional as demonstrated in the audio tape that was produced by Accornero of his statements to plaintiff. The description of the behavior of the law enforcement officials in the complaint does not describe the facts as I remember them.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate. Executed this 17th day in June, 2008, in Santa Rosa, California.

*John Silva* 6/17/2008

Supp. Declaration of John Silva
C 07-4894 SBA

3

# EXHIBIT 1

Case 4:07-cv-04894-SBA   Document 53   Filed 06/24/2008   Page 5 of 6



**6641 Agents Manual--DEA SENSITIVE**                                   Page 11 of 25

A. Generally, prisoners should be transported from the scene of arrest to the DEA office or other law enforcement facility as soon as possible. However, circumstances may dictate exceptions to this policy (e.g., the prisoner agrees to cooperate by participating in a controlled delivery, etc.). If the prisoner will be cooperating and may leave the judicial district and/or the defendant's cooperation may preclude a timely initial appearance, the prisoner may be required to sign a waiver of timely initial appearance. This document will be drafted by the federal or state prosecutor and signed by the prisoner in the presence of at least two agents or law enforcement officers.

B. The following guidelines apply to the transport of prisoners:

    1. The prisoner will be thoroughly searched beforehand.

    2. The prisoner should be placed in the rear seat, after the rear seat area is first carefully checked to ensure there is nothing present that could be used as a weapon or means of escape.

    3. The prisoner will remain handcuffed while being transported. Do not handcuff the prisoner to a fixed object in the vehicle.

    4. At least two agents, and no more than two prisoners, will be present in a single transport vehicle. If two prisoners are being transported, both will be placed in the rear seat. When more defendants are arrested than can be safely transported, assistance should be sought from local authorities.

    5. Insofar as possible, a radio-equipped vehicle should be used with the radio placed "out of service" during transport. Conversation between prisoners may be either prevented or controlled (by separate transport).

    6. Once the transport has been initiated, the vehicle will proceed directly to its destination. Only in extreme circumstances (e.g., coming to the assistance of agents in physical jeopardy) may the mission be interrupted.

C. The following guidelines apply to transporting a prisoner via commercial airline: