Michael J. Coffino (SBN 88109)
Email: mcoffino@reedsmith.com
James E. Heffner (SBN 245406)
Email: jeheffner@reedsmith.com
Christopher C. Foster (SBN 253839)
Email: cfoster@ReedSmith.com
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922

**Mailing Address:**
P.O. Box 7936
San Francisco, CA 94120-7936

Telephone:   +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Plaintiffs
Robert Carl Patrick Keane and Chieko Strange

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT CARL PATRICK KEANE, individually; and CHIEKO UEDA STRANGE, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>SETH M. MCMULLEN, PAUL ACCORNERO and JOHN SILVA,<br><br>Defendants. | No.: C 07 4894 SBA<br><br>**DECLARATION OF MICHAEL LEVINE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

I, Michael Levine declare as follows:

1.     I am currently a Police Instructor for the State of New York working on assignment from the New York State Division of Criminal Justice Services. I am also a former Supervisory Agent for the Drug Enforcement Administration ("DEA"). I have personal knowledge of the facts presented in this declaration and if called to testify I would and could competently testify to these facts.

///

///

## BACKGROUND AND RELEVANT EXPERIENCE

2. I have approximately twenty-five years experience as a federal agent. During that time, federal and state prosecutors have retained me to testify as an expert in all areas related to narcotics investigative procedures in excess of 175 occasions.

3. During my seventeen years as a DEA Supervisory Officer, I was responsible for the On the Job Training of all officers under my command in areas including, but not limited to, Controlled Delivery Tactics and Procedures, Interdiction Investigative Tactics and Procedures, Investigative Report Writing and the preparation of Probable Cause statements for warrant applications.

4. I have been involved with the supervision, planning and physical participation in more than 5,000 arrests as well as the planning, execution and review of in excess of 1000 field operations or raids. I have experience supervising thousands of narcotics trafficking and money laundering investigations, and have reviewed in excess of 300 Controlled Delivery investigations. I have been directly involved with the participation, management, training and review of over 150 Controlled Delivery Operations.

5. I have been directly involved with the investigation of instances where illegal drugs were "planted" on innocent individuals for the purpose of creating false arrest and convictions, including packages sent in a manner that would call law enforcement officer's attention to such a scenario.

6. I was assigned co-duties as an Internal Affairs Investigator, which routinely covered investigations of allegations of excessive use of force, as well as other matters related to official corruption pertinent to this review, including but not limited to violations of Standards of Conduct, police misconduct, false official statement and false reporting. These investigations covered the actions of federal agents and other local and state police officers assigned to DEA Task Force Units.

7. A true and correct copy of my resume is attached to this declaration as Exhibit A.

## BASIS OF FINDINGS AND OPINIONS

8. My findings and opinions are based on my experience, expertise and review of documents relevant to this case. A true and correct copy of the list of documents I reviewed in preparing my

opinions is attached to this declaration as <u>Exhibit B</u>.

9. I have thus far reached the following opinions in this action:

    a. The probable cause statement provided by McMullen in support of a search warrant (and arrest warrant if one exists), was false and/or deceptive, in that it was based upon elements of probable cause that were achieved through investigative action that omitted basic and standard investigative steps and/or procedures that would have resulted in exculpatory evidence for plaintiff and/or included directly false or misleading statements;

    b. The probable cause statement provided by McMullen in support of a search warrant (and arrest warrant if one exists), was false and/or deceptive, in that it was based upon elements of probable cause that were achieved by including false and/or recklessly inaccurate information and omitting facts necessary to interpret certain included facts;

    c. The defendants violated multiple law enforcement standards and conduct in the action, including with respect to the handling of the criminal investigation and the subsequent execution of the search warrant; and

    d. The defendants used excessive force in the search of plaintiffs' home and arrest of Mr. Keane in this matter.

## **THE INVESTIGATION**

10. The investigation that resulted in the search warrant, subsequent search of Plaintiffs' home and the arrest of Mr. Keane was radically inconsistent with national, professional and DEA standards and training in procedures to a degree that cannot be accepted as mere error and must be viewed as professionally unacceptable ineptitude or willful violations of those standards. Further, the investigation in this case discloses a shocking lack of recognition in and respect for the fundamental search-for-truth-principles that lie at the heart of law enforcement investigative standards.

11. For example, the belief that Mr. Keane willfully and intentionally placed a quantity of illegal drugs in a shipping package, using his correct name and address, and submitted the package to be shipped through interstate commerce, is totally inconsistent with the practices and mores of the inherently paranoid drug trafficker. In my 43 years of training and experience I have never heard of

a single case of a drug trafficker (in the position of "sender" of a shipment of illegal narcotics) using his or her correct name or address in any manner that might be linked by authorities to said interstate and/or international commerce shipment of illegal drugs. A reasonable officer would harbor suspicions about this evidence and not accept it as credible from the outset.

12. Thus, the reliance of law enforcement on the home address of Mr. Keane, because it was the return address on the package containing the marijuana, in the search warrant application (and presumably arrest warrant application), was totally unreasonable and not credible. As a result, its acceptance on face value by law enforcement in this case must be deemed both unreasonable and highly indicative of an unacceptable level of ignorance and/or ineptitude on the part of the investigating officers, as well as those officers who subsequently reviewed the action. Further, a responsible law enforcement officer, for that reason, would have discounted its importance to virtually zero when making application to the magistrate for issuance of a search and arrest warrant.

13. Further, Defendant Seth McMullen ("McMullen") made false, deceptive, and/or inconsistent statements in his probable cause affidavit and in his official investigative reporting. His sworn statements about the photo identification efforts are in substantial conflict. McMullen indicated in his DEA-6 report, dated 11/30/2006, that Ms. McGuigan "positively" identified a single photo of Mr. Keane as the man who had given her a package of marijuana. McMullen also alleged Ms. McGuigan "positively identified" the individual in his sworn probable cause statement dated 12/15/06. In McMullen's Supplemental Declaration in Support of Summary Judgment filed in the above captioned action on 6/24/2008, he swore that Ms. McGuigan said the photo "resembled" the individual who attempted to ship the package. In McMullen's Declaration in Support of Summary Judgment filed 6/24/2008, he swore that Ms. McGuigan said the photo "depicted" the individual who attempted to ship the package. Further, I understand that Ms. McGuigan recalls stating merely that the photo "looked like" the person who delivered the package to her and cannot recall law enforcement asking her for any degree of certainty.

14. The difference between "positively identified" and "resembled" or "depicted" or "looked liked," as understood by a DEA officer, when considered along with the totality of my findings, must be considered indicative of false official reporting, perjury, or a level of ineptitude and

ignorance of professional standards and training that is unacceptable as a mere "error."

15. No prosecutor, judge, or magistrate before whom I have ever presented any of the many hundreds of search warrant affidavits of my career would have accepted a "resemblance" or "depiction" as an element of probable cause indicating a "positive identification."

16. Further, the methods that law enforcement used in this case to procure a witness identification of the alleged perpetrator were totally out of keeping with standard law enforcement procedures and were highly "suggestive" and thus improper. The documents I have reviewed indicate that, for the purpose of obtaining a positive identification, McMullen presented Mrs. McGuigan a single enlarged copy of Mr. Keane's state identification card that included Mr. Keane's address matching the return address on the package containing marijuana after stating that the photo was that of a "possible suspect." This directly violates every law enforcement standard, training and procedure relating to photo identification by witnesses that I have ever been exposed to in my forty-three years of training and experience. Further, McMullen's inclusion of the address information with the photo used for identification created a situation where he was virtually directing Ms. McGuigan to identify the photo as the individual who attempted to ship the package. An identification procured in this manner is wholly unreliable and, in my opinion, should have been disclosed to the court with any search and arrest warrant application. The failure to do so is further evidence that the probable cause statement that was presented to the magistrate who issued the search and the arrest warrant (if one exists) in this case was based at least in part on deception rather than gross ineptitude.

17. The actual photo procedure that law enforcement used in this case also violated standard and accepted law enforcement procedures. Proper photo identification standards mandate that a photo identification be conducted by using, at a minimum, six photographs (a six-pack) of individuals who are similar in appearance to the suspect. The use of a single photo, wholly apart from the "suspect" comment and the inclusion of the home address with the photo, was improper in this instance. There was no justification of which I am aware to depart from proper identification standards. The clear inference is that law enforcement was seeking to implicate "someone," without any concern for his innocence and any interest in honoring the search-for-truth principles.

18. Further, every Controlled Delivery operation includes the possibility that the purpose for mailing the package containing drugs may be to falsely implicate an innocent individual. The investigating officers conducted a substandard investigation that did not inquire into this possibility.

19. For example, standards and training regarding interdiction and controlled delivery operations mandates that the originating location and the receiving location be investigated as a single conspiracy. In this case, the two locations were Petaluma, California and Brick, New Jersey.

20. John Murphy, local law enforcement in New Jersey, is the only officer who had contacts between the two sides of the bifurcated investigation, yet there is no indication that Mr. Murphy prepared a report. Nor is his name found in any of the documents. The absence of any records from Mr. Murphy is a substantial violation of investigation standards and raises a strong probability that significant exculpatory evidence uncovered by Mr. Murphy was knowingly excluded, and/or excluded due to an unacceptable level of ineptitude, from the statement of probable cause.

21. Similarly, McMullen had powerful tools at his disposal that would have quickly established the existence or nonexistence of conspiratorial communications between Mr. Keane and the recipients of the package. For example, a telephone toll analysis would quickly reveal whether any of the phone numbers associated with Mr. Keane had telephoned any number that was directly or indirectly associated with the alleged receiver of the drugs. I have seen nothing to indicate the investigating officers undertook any of these simple and powerful investigative steps. Any toll analysis that did not reveal phone calls between Mr. Keane and the recipients of the package, to any phone numbers both parties may have been calling in common, or to any phone numbers called by either party that were even in the same geographical area of one another would constitute exculpatory evidence, which should have been included in investigative reporting, so that the magistrate, a DEA supervisory reviewer and/or a prosecutor, could make an independent determination of whether probable cause for a search or arrest existed. In fact, I understand that defendants confiscated telephone records as part of their search of Plaintiffs' home that contained no calls to or from New Jersey. This is a mere sample of the exculpatory evidence defendants would have yielded with use of the most basis investigative tools easily at their disposal (had they cared to search for the "truth").

22. In addition, Special Agent McMullen should have made attempts to lift and analyze latent fingerprints from beneath the inside of the packaging. I have seen nothing to indicate the investigating officers undertook this standard investigative procedure. Latent fingerprints taken from that part of the package handled by someone actually preparing the shipment, that did not match those of Mr. Keane, would have been further exculpatory evidence law enforcement should have included in investigative reporting, again to allow the magistrate and/or prosecutor and/or DEA supervisory reviewer to make an independent determinations of whether probable cause for a search or arrest existed.

23. No ascertainable attempts were made to conduct a professional level of investigation in adherence with the search-for-truth principles that are the basis of all U.S. law enforcement investigative procedures over the three week period of time between the seizure of the suspect package and Mr. Keane's arrest. This absence of investigative effort is too aberrant from standards and procedures to be accepted as mere error or oversight, and must be considered indicative of a professionally unacceptable level of ineptitude or worse.

## KNOCK AND ANNOUNCE STANDARDS

24. With the exception of no-knock warrants, it is mandatory that all U.S. Law Enforcement officers announce their identities and purpose and wait a reasonable period of time under the specific circumstances of the moment, before entering a home pursuant to a search warrant. Based on Plaintiffs' evidence, it is clear that law enforcement in this instance acted in a manner that was inconsistent with this mandate. Further, based on my review, the "dynamic entry" procedure described in the declaration of Nikos Eliopoulos in Support of Summary Judgment filed in the above captioned action on 6/24/2008, was not the appropriate method of entry because nothing indicates the officers were refused entry or waited a reasonable amount of time before entering.

## DEGREE OF FORCE USED

25. I am of the view that law enforcement used excessive force against Plaintiffs and their property in at least a few different respects. For example, it is an intrinsic part of training for all U.S. Law Enforcement that a loaded weapon never be pointed directly at an individual unless the officer is preparing to fire. In the present case, the officers' training of their weapons on Plaintiffs is a

radical departure from DEA standards and training, and national and professional standards regarding the execution of a search or arrest warrant.

26. Further, placing a boot on the head of a handcuffed suspect is an act that is beyond the scope of any use of force training or law enforcement Code of Conduct I have been exposed to, and in my opinion, is an abuse of power, excessive, unreasonable and demeaning. It has no legitimate law enforcement purpose whatsoever.

### PARTICIPATION OF MR. SILVA

27. I understand that Mr. Silva claims a strong degree of non-involvement in the investigation and subsequent search. In this regard, I would note that it is standard DEA Policy to prepare a written raid plan and to have a pre-operational meeting where the background of the case and specific assignments are given and discussed. This standard meeting would also provide the officers with information on the tactics that are going to be used in entering the home and executing the search and arrest. John Silva ("Silva"), as a Task Force Officer participating in the search of the Plaintiffs' home, would have been present at such a meeting. This can only vary with exigent circumstances, *i.e.*, people about to flee the scene or to destroy evidence. Thus, Mr. Silva can be presumed to be integral to the operation that occurred that day.

28. Mr. Silva, as an officer participating in the execution of a search warrant for narcotics, would be derelict in his duty and in violation of codes of professional conduct if he participated without being armed with a weapon.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of August, 2008 in the City of High Falls, NY.

*[signature] 8/4/08*
Michael Levine, Consultant