Michael J. Coffino (SBN 88109)
MCoffino@ReedSmith.com
James E. Heffner (SBN 245406)
JEHeffner@ReedSmith.com
Christopher C. Foster (SBN 253839)
CFoster@ReedSmith.com
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922

**Mailing Address:**
P.O. Box 7936
San Francisco, CA 94120-7936

Telephone:    415.543.8700
Facsimile:    415.391.8269

Attorneys for Plaintiffs
Robert Carl Patrick Keane and Chieko Strange

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT CARL PATRICK KEANE, individually; and CHIEKO STRANGE, individually,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>SETH M. MCMULLEN, PAUL ACCORNERO and JOHN SILVA,<br><br>                    Defendants. | No.: CV-07-4894 SBA<br><br>**DECLARATION OF ROBERT CARL PATRICK KEANE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:     September 16, 2008<br>Time:    1:00 p.m.<br>Place:    Courtroom 3, 3rd Floor<br>Before:  Hon. Saundra B. Armstrong |

I, Robert Carl Patrick Keane declare as follows:

1.   I am one of the Plaintiffs in this action. I have personal knowledge of the facts in this declaration and if called to testify, I would and could competently testify to them.

2.   I currently reside at 307 N. Ferndale Ave., Mill Valley, CA 94952 with Chieko Strange ("Chieko"), the other Plaintiff in this action, and have resided there with Chieko at all times relevant to this action.

3. Our Mill Valley home is a small, two-bedroom loft on a quiet residential street, which Chieko and I purchased in 2002.

4. The architecture of our house includes a typical A-frame loft with thin, uninsulated plywood walls. Our glass front door opens into a common open space with a kitchen and family room on the first floor. The loft is above the kitchen on the second floor with a banister that looks down over the living room and front door. The loft is connected to an upstairs bedroom and bathroom. From the loft, I normally can easily hear conversation outside my closed front door. A true and correct picture of the loft of my home is attached hereto as <u>Exhibit A</u>. The picture was taken from the perspective of the front door of my house, looking up towards the loft.

5. I am currently employed as a salesperson at Saks Fifth Avenue in San Francisco, CA. I have been an employee there since 1996.

6. On December 19, 2006, I was in the upstairs loft of my Mill Valley home with Chieko. I was ironing clothes for the day while Chieko was getting dressed for work. We did not have any radio, television or musical device on. It was a quiet, normal weekday morning in our home.

7. At approximately 7:30 a.m., I heard one or two seconds of commotion outside the front of our home followed by an unusually loud bang outside the front door. The bang sounded like someone slamming something very heavy into the wood deck that leads to the front door of my home.

8. I immediately went to the loft banister and looked down towards the front door to my home. A true and correct copy of a photograph, taken of the front door of our home, is attached hereto as <u>Exhibit B</u>. The picture in Exhibit B shows the same front door I looked out from the loft banister on the morning of December 19, 2006.

9. The moment I looked over the loft banister I saw a man through the glass front door who I later came to understand was Seth McMullen ("McMullen"). The man was dressed in dark clothing, and was crouched in the corner of the deck that leads to the front door. He had a rifle in his hand.

10. As soon as I got to the loft banister I heard McMullen shout "There he is!" McMullen immediately jumped up, threw open the front door causing it to bang loudly against the kitchen counter, and trained his weapon on me as he rapidly entered our home.

11. Prior to McMullen's entry, I did not make any movement in any way and did not have a chance to give consent to the officers to enter my home. I stayed frozen out of fear as they stormed into our home. I had no idea who these people were.

12. At least two similarly dressed men immediately followed McMullen into the house. These men also had rifles, and all pointed them directly up at the loft as they entered our home. I was frozen as I looked down the barrels of their guns.

13. As the men entered the home they were shouting and screaming "Where are your weapons!" and "Get down on the floor!" The sound of their boots banging on the wood floor reverberated through the house.

14. Chieko, who was also in the loft at the time, screamed for me to call the police.

15. The men came racing up the stairs continuing to scream "Where are your weapons!" and "Get down on the floor!"

16. I have never owned any weapons nor have I ever had any weapons registered in my name.

17. When the men came into the loft they continued to point their weapons at us and continued to scream "Get down on the floor!" At this point, not a single one of the individuals in our home had identified themselves as a law enforcement agent.

18. I was frightened and confused and complied with their orders to lay down on the floor of the loft. Chieko also laid down on the floor of the loft at this time.

19. As I laid down on the ground I asked "Who are you?" at least three times as I stared down the barrel of the weapon being pointed at me by McMullen.

20. As Chieko and I laid down, McMullen and the other officer in the room continued to point their weapons at both of us.

21. After I laid down on the ground, McMullen responded "You know why we're here."

22. McMullen and the other officer continued to train their weapons on us until we were face down. I was then handcuffed while lying face down. After I was handcuffed, I noticed a patch on the shoulder of an officer's uniform that indicated he was a law enforcement officer. To the best of my recollection the patch read "DEA Santa Rosa Drug Task Force." It was not until this point that I realized that the individuals in my home were law enforcement agents.

23. The handcuffs were put on me so tightly that they hurt.

24. At this time, I heard our two dogs barking. Chieko and I were laying parallel on the floor about six feet apart. Chieko and I looked at each other and I was wondering what was happening with the dogs when I witnessed McMullen place one of his boots on Chieko's head.

25. While I laid face down on the ground I heard some of the officers saying "where should we do this."

26. After laying on the ground for approximately 10 minutes, McMullen, without first asking me to get up, lifted me up by the chain of the handcuffs. It was either the tight handcuffing or this lifting action that caused cuts to both of my wrists. A true and correct copy of a photograph of the cuts to my wrists is attached hereto as Exhibit C.

27. After McMullen lifted me up by my handcuffs he took me downstairs and took my picture. McMullen and John Silva ("Silva") then sat me on the toilet in our downstairs bathroom. At this point, McMullen looked at me, turned to Silva and stated, "Isn't this ironic?" This was confusing and humiliating.

28. McMullen then told me about a package of drugs that someone had tried to ship from a "UPS Store" in Petaluma, CA, which I later learned to be the Mail depot. McMullen told me that my return address was on the package. My first response to him was "What kind of a moron puts their own return address on a package of drugs?"

29. Silva showed me a photocopy of a picture of a cardboard box, Christmas wrapping paper and a plastic bag and said that they found my fingerprints on the Christmas wrapping paper. I told them that they could not have found my fingerprints on the Christmas wrapping and even offered to have them fingerprint me. I also told McMullen and Silva that I had not been to Petaluma in years and insisted that I had never been to a UPS store in Petaluma.

30. Silva then showed me a photocopy of a picture of someone named Brian Keane and said something like "Don't you see the resemblance?" I laughed and said that I did not. He then said something like "You mean you don't have any relatives in New Jersey?" I responded that I have a cousin in Santa Barbara named Brian Keane but that I did not have any relatives in New Jersey.

– 5 –

31. Aside from my cousin in Santa Barbara, I do not know anyone named Brian Keane. I do not have any relatives in New Jersey.

32. At this point McMullen told me "I don't have to do this but I will" and then read me my Miranda rights. I told McMullen and Silva that I understood my rights. McMullen and Silva each asked about the same number of questions.

33. I did not attempt to ship the package that the officers were investigating, nor have I ever attempted to mail any illegal drugs of any kind. I told McMullen and Silva that there were no drugs in my house. There have never been illegal drugs of any kind in my house.

34. After McMullen and Silva questioned me, they took me into the living room and sat me down on the couch.

35. At some point during the search, Paul Accornero ("Accornero") came into the house, identified himself as a Petaluma Police Officer and warned me about his use of an ultra-sensitive drug dog that they were going to bring into the house. The warning scared me. I was frightened for the safety of my two pet dogs and for the safety of my property. Accornero threatened that the dog was trained to "tear shit up." I was not aware that anything was being recorded.

36. The way that Accornero handled the dog frightened and intimidated me.

37. After Accornero left, McMullen and Silva brought Chieko, still handcuffed, into the living room and sat her in a side-chair across from me on the couch.

38. Chieko asked me what was going on and McMullen shouted at her "Shut up or I'll put your face against the wall!"

39. After that, I saw McMullen and Silva talking to one another, but I did not hear what they were saying.

40. Silva gave some papers to Chieko for her to sign. After she signed them, Silva and McMullen led me out to one of their vehicles.

41. The vehicle used to transport me was a dark SUV.

42. Silva transported me to the Sonoma County Detention Center. Silva drove while McMullen sat in the backseat. On the way, Silva dropped McMullen off in Marin City and he followed us to the Detention Center in another vehicle.

43. At the jail, a female officer searched my body while McMullen and Silva watched. Both McMullen and Silva had expressions of amusement on their faces. I was wearing sweatpants and my buttocks were partially exposed. The female officer apologized to me for the way I was being treated.

44. After I was searched, I was taken to an officer that told me that bail was going to be $20,000. I spent the entire day in jail, and that night, Chieko came down and bailed me out.

45. At no time during the raid of our home, the arrest, or the booking, was I presented with a warrant for my arrest or a warrant for the search of our home. To this day, I still have not seen a warrant for my arrest.

46. I went home with Chieko and surveyed the damage that had been done to my property during the search. An antique chest had been severely scratched. A kitchen cabinet door had been broken off of its hinges. Our couch had been torn. A slat to our front gate had been broken. The wood floors have been damaged. And, the front yard fence is now in need of repair as a result of this incident.

47. Attached hereto as Exhibit D is a true and correct copy of my California state identification card. To the best of my knowledge, the information on file with Department of Motor Vehicles at the time of the investigation and search was the same as shown on this identification card.

48. I contacted the 415 number listed with Bob Hart's return address information at the Mail Depot. I was informed by the person who answered the phone that the number is for Bob Hart,

///
///
///
///
///
///
///
///
///

Mr. Hart had that number at the time the package was purportedly shipped in his name and Mr. Hart never shipped a package from the Mail Depot in Petaluma.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of August, 2008, in Mill Valley, CA.

DATED: August 5, 2008

By: _____/S/_____
Robert Carl Patrick Keane

**Signature Attestation**

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this efiled document.

James Heffner