1  Michael J. Coffino (SBN 88109)
   MCoffino@ReedSmith.com
2  James E. Heffner (SBN 245406)
   JEHeffner@ReedSmith.com
3  Christopher C. Foster (SBN 253839)
   CFoster@ReedSmith.com
4  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
5  San Francisco, CA  94111-3922

6  **Mailing Address:**
   P.O. Box 7936
7  San Francisco, CA  94120-7936

8  Telephone:   415.543.8700
   Facsimile:    415.391.8269
9
   Attorneys for Plaintiffs
10 Robert Carl Patrick Keane and Chieko Strange

11                UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13 ROBERT CARL PATRICK KEANE,                No.: CV-07-4894 SBA
   individually; and CHIEKO STRANGE,
14 individually,                             **DECLARATION OF CHIEKO STRANGE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
15               Plaintiffs,

16        vs.                                Date:    September 16, 2008
                                             Time:    1:00 p.m.
17 SETH M. MCMULLEN, PAUL ACCORNERO           Place:   Courtroom 3, 3rd Floor
   and JOHN SILVA,                           Before:  Hon. Saundra B. Armstrong
18
                 Defendants.
19

20

21        I, Chieko Strange, declare as follows:

22 1.     I am one of the Plaintiffs in this action.  I have personal knowledge of the facts in this

23 declaration and if called to testify, I would and could competently testify to them.

24 2.     I currently reside at 307 N. Ferndale Ave., Mill Valley, CA 94952 with Robert Carl Patrick

25 Keane ("Carl"), the other Plaintiff in this action, and lived there with Carl at all times relevant to this

26 action.

27 3.     I have been employed as a salesperson at Saks Fifth Avenue in San Francisco, CA since 1995

28 to the present.

CV-07-4894                            – 1 –

DECLARATION OF CHIEKO STRANGE

4. On December 19, 2006, I was in the upstairs loft of my Mill Valley home with Carl. He was ironing cloths and I was getting dressed for work. We were not listening to the radio or music or watching television. The room and house were very quiet.

5. At approximately 7:30 a.m., I heard an unusually loud bang outside our home. It sounded like someone slamming a very heavy object into the wood deck leading to the front door of our home. Within seconds of the banging, I saw Carl run towards the banister of the loft and look down towards the front door to our home. Almost instantaneously, I heard people storming into the house shouting and screaming "Where are your weapons!" and "Get down on the floor!"

6. I saw Carl freeze at the loft banister.

7. I never consented to the entrance of these individuals into our home and never heard them announce who they were or why they were there. I have never owned any weapons or ever had any weapons registered in my name.

8. I thought that we were the victims of a home invasion robbery and I shouted at Carl to call the police.

9. The men came racing up the stairs continuing to scream "Where are your weapons!" and "Get down on the floor!" When the men came into the loft they pointed their weapons at both Carl and me and continued to scream "Get down on the floor!"

10. At this point, not a single one of the individuals in our home had identified themselves as a law enforcement agent. I was very frightened and confused and I complied with their orders to lay down on the ground. As I laid down on the floor, these men continued to point their weapons at both of us.

11. At no time did I resist any of their commands or attempt to flee. I still did not know who these men were and still thought that we were the victims of a home invasion.

12. I heard Carl ask one of them who they were. The officer responded "You know why we're here."

13. After I laid face down on the ground, an officer handcuffed me behind my back. I did not resist, but complied with whatever they asked me to do. At this point I heard our two dogs barking and lifted my head up to see what was happening. One of them, who, to the best of my recollection,

1  was the same person who later identified himself as Special Agent Seth McMullen ("McMullen"),
2  placed his boot on the back of my head and I immediately put my head back down.

3  14.    While I laid face down on the ground I heard some of them saying "where should we do
4  this."

5  15.    After lying on the ground for approximately ten minutes, a Marin County Sherriff officer
6  helped me get up off the ground, as I was still handcuffed. He led me into the bedroom, sat me
7  down on the bedroom chair and asked me where my purse was. I told him. He then told another
8  officer to retrieve my purse from downstairs. The officer brought the purse back upstairs and the
9  Marin County Sherriff officer began to go through my purse and question me about my identity, my
10 birth date, and various other matters including my citizenship. This lasted for approximately fifteen
11 to twenty minutes.

12 16.    After the questioning, I could hear a dog scratching around downstairs as though it was
13 tearing the house apart. I heard some officers talking about bringing a dog upstairs. I feared for the
14 safety of my dogs, who were also upstairs, and I asked them to please not hurt my dogs. The
15 officers then put my dogs in the bathroom and shut the door.

16 17.    The officers then led me down the stairs while I was still handcuffed and had me sit on the
17 toilet in our downstairs bathroom. Being questioned while seated on the toilet was totally
18 humiliating.

19 18.    An officer who identified himself as John Silva ("Silva") read me my Miranda rights. I
20 asked if I was being arrested and he said no. Throughout the entire search of our home, whenever I
21 saw McMullen, Silva was with him.

22 19.    McMullen asked me how long I had known Carl and I told them that I had known him for ten
23 years. McMullen asked me how long I had worked at Sak's Fifth Avenue and I told them that I had
24 worked there for over eleven years.

25 20.    While McMullen continued his questioning, Silva conducted a search of the bathroom. He
26 went through the antique chest and bathroom cabinets. Silva then went through my address book
27 and some old Christmas cards.

28

21. Silva asked me questions about people that were in my address book. In particular, he asked me about Carl's parents and where they lived.

22. McMullen then showed me a photocopy of a picture of someone named Brian Keane and asked me if I thought he looked like Carl. After McMullen retrieved my glasses, Silva put them on my face because I was still handcuffed. I told them I did not think the person looked like Carl.

23. McMullen asked me if Brian Keane was a relative of Carl's. I told them that he was not a relative of Carl's and that Carl had no relatives in New Jersey.

24. McMullen and Silva then told me that a package had been mailed from Petaluma and showed me a picture of a package that had "C. Keane" with our home address on it.

25. I told McMullen and Silva that I had never seen Carl write his name in that manner and, in fact, I have never seen Carl write his name in that manner.

26. At this point McMullen left and came back while Silva continued to question me. A few minutes later McMullen returned with a puzzled look on his face. He looked at me and said "something wrong is going on here," in apparent frustration that the search had turned up no evidence of drug activity or other criminal conduct.

27. Seth McMullen and John Silva then brought me, with my wrists still handcuffed behind my back, into the living room and sat me on the side-chair across from Carl, who was seated on the couch.

28. I asked Carl what was going on and McMullen shouted at me: "Shut up or I'll put your face against the wall!" This frightened me very much.

29. After that, I saw and heard McMullen and Silva talking with each other.

30. I heard Silva ask McMullen about what they were going to do with Carl. I heard McMullen tell Silva that Carl was going to be taken to jail.

31. At this point, I had been handcuffed behind my back for over an hour.

32. Before Silva and McMullen exited with Carl, Silva removed my handcuffs and gave me some papers to sign that contained an inventory of the items they were seizing from our home. The list of items included a Wells Fargo deposit slip from my bank, an AT&T bill and a copy of the results of Carl's cholesterol test.

33. I signed the papers. I asked Silva where they were taking Carl, and he told me Santa Rosa. McMullen then shouted at me in an agitated voice "He's going to jail!"

34. Also at this time, Silva produced a document I later learned to be a search warrant, and left it on the table without explanation.

35. After McMullen shouted at me, he and Silva exited the house with Carl still handcuffed.

36. At no point during the search of our home did I hear Silva object to the way Carl and I were being treated. Nor did any of the other intruders object to our treatment.

37. The officers left our home damaged and in total disarray.

38. Later that day, I went to the Sonoma County Main Adult Detention Center and posted a bail bond for $20,000. Carl was released from jail that evening. I have never seen an arrest warrant for Carl and did not see the search warrant until it was left on the table on Silva's way out of our home.

39. I took Carl home and we surveyed the damage that had been done to our property during the search.

40. An antique chest had been severely scratched, a kitchen cabinet door had been broken off of its hinges, our couch had been torn and a slat to our front gate had been broken. We also later discovered a dent in the wooden deck leading to our front door and damage to the front yard fence.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed this 5th day of August, 2008, in Mill Valley, CA.

DATED: August 5, 2008

By:  /S/
Chieko Strange

**Signature Attestation**

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this efiled document.

James Heffner